**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AMANDA STEELE,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:24-cv-3674** |
| | : | |
| **v.** | : | **Judge Algenon L. Marbley** |
| | : | |
| **SUMMIT HOME HEALTHCARE, LLC,** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendant.** | : | |
| | : | |

**OPINION & ORDER**

This matter is before this Court on the parties' cross motions for summary judgment. (ECF Nos. 20, 21). For the reasons set forth below, this Court **GRANTS** Summit's Motion for Summary Judgment and **DENIES** Steele's Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background

On July 8, 2024, Plaintiff Amanda Steele filed a complaint against her former employer Summit Home Healthcare LLC, ("Summit"), alleging that she was wrongfully terminated because of her pregnancy and use of FMLA leave in violation of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e, et seq., the Family and Medical Leave Act, 29 U.S.C. 2601, et seq., and the Ohio Civil Rights Act, O.R.C. 4112.01, et seq. (ECF No. 1).

Summit is a home healthcare company that provides in-home nursing care to hospice patients. (ECF Nos. 1 at 2; 21 at 2). Steele began her employment with Summit as a contingent registered nurse case manager in 2014. (ECF No. 21 at 2). In early 2015, Steele began working as a full-time Summit employee and received several promotions throughout her nearly 10-year tenure at Summit. (ECF No. 20 at 2). Steele was promoted to Clinical Manager and then Director

of Nursing, and subsequently to Director of Operations before finally being promoted to Director of Quality Assurance, a role she served in up until her termination in 2023. (*Id.*).

In 2022, Summit's Chief Executive Officer, Rob Becker, began discussing starting his own home health care company with Summit employees. (*Id.*). Steele was one of these employees and admits that Becker asked her if she would be willing to join his company. (ECF No. 17-1 at 51). Steele testified that despite these conversations, she never agreed to join the company or signed anything. (*Id.*). Subsequently, in January 2023, Becker took a medical leave of absence from the company. It is alleged that during this time, the company suffered turmoil. (ECF No. 1 at 3). Becker, however, occasionally checked in with various employees during his hiatus. (*Id.*). During this same period, Guy Jones, Summit's Director of Operations, resigned from Summit effective March 6, 2023. (*Id.*). Days later, on March 13, 2026, Becker asked Steele to provide Jones with a copy of the Master Weekly Report, which contained Summit's total weekly patient interactions across the various lines of service. (*Id.*). Steele testified Becker informed her that Jones was returning to the company and needed access to the report. (ECF No. 17-1 at 115). Jones then texted Steele requesting a copy of the Master Weekly Report and provided her with his personal email. (ECF No. 1 at 3). As instructed by Becker, Steele sent the Master Weekly Report link to Jones's personal email. (*Id.*). The very next day, Summit terminated Becker. (*Id.* at 4). Steele never reported that Becker instructed her to email the report to Jones and carried on in her role as usual. (ECF No. 17-1 at 125).

On May 30, 2023, Steele began her maternity leave about which she had informed Summit in October 2022. (ECF No. 1 at 4). That same day, Joe Bair, Steele's supervisor and Summit's Director of Compliance, discovered that Jones somehow had access to the Master Weekly Report via Jone's personal email. (ECF No. 20, Exhibit B). Bair then emailed Aaron Albrecht, Chief

Clinical Officer, and two other employees regarding Jones's access. (*Id.*). It is alleged that Bair subsequently reviewed Steele's emails and discovered that Steele was the person who had shared the Master Weekly Report to Jones's personal email. (ECF No. 1 at 4). Bair, however, contends that he had no access to Steele's email, nor did he know who gave Jones access to the list. (ECF No. 19-1 at 33–34). Bair further testified that after discovering Jones's access, he inquired with HR as to whether Steele had signed the company handbook, given that she oversaw the sending of the Master Weekly Report and thus was sending the report to an email outside the company. (*Id.* at 34).

Aaron Albrecht testified that after receiving notification from Bair regarding Jones's access to the Master Weekly report, he notified Karen Vahlberg, who was serving as interim CEO, and John Murta, Chief Operating Officer of Deaconess, a company that owned a stake in Summit and had begun managing the company. (ECF No. 18-1 at 21). Albrecht attests that he, Vahlberg, and Murta discussed the investigation and worked with IT to determine who shared the report with Jones. (*Id.*). On June 8, 2023, the IT Department confirmed that the email was indeed sent to Jones by Steele. (ECF No. 20-1, Exhibit C). According to Albrecht, Murta made the ultimate decision to terminate Steele. (ECF No. 18-1 at 36). Bair also testified that he shared his opinion that Steele's conduct was a terminable offense, given that she had shared confidential information with a potential competitor to company leadership, Bair, however, asserts that he was not involved in the investigation into Steele, nor the ultimate decision to fire her. (ECF No. 19-1 at 41–42). Subsequently, on June 30, 2023, Summit terminated Steele while she was on maternity leave, citing an ethics violation related to forwarding an email to someone outside the company. (ECF Nos. 1 at 4; 21 at 4). She was replaced by Jessica Spriggs, a non-pregnant Summit employee. (*Id.*).

Following Becker's termination, he formed Evolution, his own home healthcare company. (ECF No. 20 at 3). Steele worked for Evolution from November 2023 to May 2024. (ECF No. 17-1 at 12–13).

### B. Procedural History

On or about September 15, 2023, Steele filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (ECF No. 1 at 2). The EEOC later issued a notice of right to sue on April 12, 2024. (*Id.*). Then Steele filed her complaint against Summit alleging pregnancy discrimination and FMLA interference on July 8, 2024. (ECF No. 1). On October 17, 2025, Summit filed its Motion for Summary Judgment (ECF No. 20). That same day, Steele filed her Partial Motion for Summary Judgment (ECF No. 21). These Motions have been fully briefed and are now ripe for this Court's review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a

verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad.*, 929 F.2d at 248 (citing *John v. State of La.* (*Bd. of Tr. for State Colleges & Univ.*), 757 F.2d 698, 705 (5th Cir. 1985)).

## III. ANALYSIS

### A. Pregnancy Discrimination

Under Ohio law, employers are prohibited from engaging in discrimination based on pregnancy. *See* O.R.C. 4412.01(A). Ohio law on pregnancy discrimination coincides with the Federal Pregnancy Discrimination Act which prohibits the same conduct and therefore is analyzed under the same framework. *Birchard v. Marc Glassman, Inc.*, 2003-Ohio-4073, ¶ 12 ( "Case law interpreting and applying Title VII of the Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000 et seq. ("Title VII"), is generally applicable to cases involving R.C. Chapter 4112.").

A plaintiff may prove pregnancy discrimination claims based on either direct or circumstantial evidence. *Ondricko v. MGM Grand Detroit*, *LLC*, 689 F.3d 642, 648-649 (6th Cir. 2012) (citing *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004)). Steele seeks to establish an indirect violation. To prevail on an indirect pregnancy discrimination claim, a plaintiff must first establish a prima facia case under the *McDonnell-Douglas* burden-shifting framework. *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to present a legitimate, nondiscriminatory reason for the alleged violative conduct. *Burdine*, 450 U.S. at 253. If the defendant presents a nondiscriminatory reason successfully, the burden then shifts back to the plaintiff to prove that the defendant's explanation is merely a pretext for discrimination. *Id.*

### *1. Prima Facia Case*

To establish her prima facia case, Steele must demonstrate that: (1) she was pregnant; (2) she was qualified for her position; (3) she faced an adverse employment decision; and (4) there was a nexus between her pregnancy and the adverse employment decision. *Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). It is undisputed by either side that Steele was pregnant during the relevant time period and that she was fired. Thus, prongs one and three are satisfied. Summit argues, however, that Steele cannot satisfy the second prong of her claim.

First, this Court will analyze whether Steele was qualified for her position. Under the second prong, Steele must demonstrate "that she was performing 'at a level which met [her] employer's legitimate expectations.'" *Id.* (citing *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir. 1990)). Steele contends that there can be no dispute that she was qualified for her

role as the Quality Assurance Director. (ECF No. 21 at 10). Steele points to her various promotions from PRN all the way up to Quality Assurance Director during her tenure at Summit and the $20,000.00 performance-based bonus she received shortly before her termination. (*Id.*).

In Summit's view, Steele was not qualified for her position given she failed to meet Summit's legitimate expectations of confidentiality when she shared the Master Weekly Report. (ECF No. 20 at 13). Yet Summit does not point to any other instances outside of sharing the Master Weekly Report that demonstrates Steele was not qualified for her position, nor does Summit address Steele's consistent promotions over a nine-year period. Additionally, Summit's cited case law is not analogous to this case. For example, in *Warfield v. Lebanon Corr. Inst.*, the Sixth Circuit found that the plaintiff failed to satisfy the second element where she failed entirely to argue that she was qualified and could not dispute seriously the employer's evidence that she was deficient in many job categories. 181 F.3d 723, 729 (6th Cir. 1999) ("She does not … seriously dispute the prison's claims that she, *inter alia*, had difficulty supervising inmates, gave inaccurate 'range counts,' did not respond properly to prison alerts, permitted too many inmates out of their cells, inappropriately engaged in conversation with inmates, and did not properly keep inmates in order during 'mass movement.'"). On the contrary, here, Steele cites a steady pattern of promotions indicating employer satisfaction with her performance, which refutes Summit's attempt to cast doubt on her qualifications. Steele's steady history of promotions compared to the singular incident at issue is more persuasive for this Court's determination regarding Steele's qualifications.

Given that Summit only cites the incident at issue, this Court is not convinced that Steele was not performing to Summit's standards for purposes of establishing a prima fascia case. *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) ("For purposes of the prima facie case analysis, a plaintiff's qualifications are to be assessed in terms of whether

he or she was meeting the employer's expectations prior to and independent of the events that led to the adverse action."); *see also Pizzimenti v. Oldcastle Glass Inc.*, 666 F. Supp. 2d 839, 846 (N.D. Ohio 2009) (finding the second element satisfied where the employer offered no evidence of the plaintiff being unqualified outside of their argument regarding their legitimate nondiscriminatory reason). This Court must look to the Steele's "objective qualifications, such as her education, experience in the relevant industry, and possession of the general skills required for the position." *Kulik v. Medical Imagine Res., Inc.*, 325 F. App'x 413, 414 (6th Cir. 2009) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)). Steele has a nursing degree and had steadily worked her way up the chain of command over the near decade she worked for Summit. For these reasons, this Court finds Steele has established that she was qualified. Thus, the second element is satisfied.

Next, this Court analyzes whether Steele has shown that there was a nexus between her pregnancy and the adverse employment decision. Steele argues that she has satisfied the fourth element for two reasons: (1) she was replaced by someone outside of her protected class; and (2) because she was terminated four weeks into her protected twelve-week maternity leave, a causal connection is established via temporal proximity. (ECF No. 21 at 11). First, a plaintiff may establish a nexus by demonstrating that she was replaced by an employee outside her protected class in combination with other factors. *See Cox v. Little Clinic of Tennessee, LLC,* 2020 WL 6685517, at *10 (M.D. Tenn. Nov. 12, 2020), *aff'd,* 858 F. App'x 176 (6th Cir. 2021). Here, it is not disputed that Steele was replaced by Jessica Spriggs, a non-pregnant Summit employee. Additionally, the Sixth Circuit has also reasoned that "[t]emporal proximity can establish a causal connection between the protected activity and the unlawful employment action." *Asmo v. Keane*, 471 F.3d 588, 593 (6th Cir. 2006). Specifically, the Sixth Circuit has held that two months

between the adverse action and the pregnancy could establish a nexus. *Id.* at 594. Such temporal proximity is measured from the date of the employer's awareness of the pregnancy. *Ward v. Sevier Cnty. Gov't*, 440 F. Supp. 3d 899, 907 (E.D. Tenn. 2020). Here, it is undisputed that Steele was fired only four weeks into her maternity leave. Notably, however, Steele informed Summit of her pregnancy back in November 2022, and was approved for leave in May of 2023. (ECF No. 19-2 at 41, 55). Thus, there are several months between Steele's termination and Summit becoming aware of her pregnancy making the temporal nexus attenuated. *See Panetta v. Sheakley Grp., Inc.*, 707 F. Supp. 2d 767, 772 (S.D. Ohio 2010) (reasoning that an eleven-month gap between knowledge of pregnancy and termination strongly suggested no link). Despite such, this Court finds Steele has established a nexus where: there is not an onerous burden of establishing a prima facia case; Steele has established she was replaced by a non-pregnant employee; she was not approved for leave until May 2023; and notably, Summit makes no argument that the fourth prong is not satisfied.

*2. Legitimate Non-Discriminatory Rationale*

Given Steele has met her burden of establishing a prima facia case, the burden now shifts to Summit to provide a legitimate nondiscriminatory rationale for its conduct. "The burden that shifts to the defendant ... is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Moreover, the defendant must merely create a genuine issue of fact as to whether it discriminated against the plaintiff by setting forth a "legally sufficient" reason for the employer's action. *Cline*, 206 F.3d at 666 (quoting *Burdine*, 450 U.S. at 255).

Summit posits that the principal reason for Steele's termination was her disclosing confidential information to a former employee by sharing the Master Weekly Report with Jones. (ECF No. 22 at 3). Summit argues it has satisfied its burden because it is undisputed that: (1) Steele added Guy Jones, a former employee, to the distribution list for the Master Weekly Report; (2) Bair discovered Jones's email on the distribution list on May 30, 2023, and reported this to company leadership; and (3) Albrecht and HR Representative Cynthia Mercer informed Steele that her termination was due to an ethics violation related to distributing company information to someone who did not work for the company. (*Id.* at 4). Summit also contends that it is not dispositive that there are discrepancies in the testimony from Summit's leadership regarding who made the final decision to terminate Steele. (*Id.*). In Summit's view, no matter who made the final decision to terminate Steele, Summit's nondiscriminatory reason for Steele's termination is not diminished given that Summit has produced evidence that Steele broke company policy. (*Id.*).

In Steele's view, Summit cannot meet its burden where it has failed to identify the ultimate decisionmaker for Steele's termination. (ECF No. 21 at 13). Summit offered both Bair and Albrecht as individuals with personal knowledge of the matter, yet neither made the ultimate termination decision. Steele thus highlights that neither witness has first-hand knowledge of the ultimate decision to terminate. Steele further contends that if John Murta, who was not deposed, made the final decision to terminate Steele, then Summit has failed to present any admissible evidence demonstrating their legitimate and nondiscriminatory rationale. (ECF No. 25 at 6). Steele argues that without the identity of the decisionmaker, Summit "cannot offer evidence about the motivations of an individual" who made the decision and therefore cannot rebut the inference of discrimination. (ECF No. 21 at 13).

This Court finds that Summit has offered a legitimate, nondiscriminatory rationale. Despite Steele's contentions, pursuant to *Burdine*, Summit must merely offer a legitimate reason for the action at issue. *Burdine*, 450 U.S. at 254–255. Summit has offered a legitimate and nondiscriminatory reason by citing Steele's sharing of the report containing confidential information with Jones, which was against company policy. *See Woodworth v. Concord Mgmt. Ltd.*, 164 F. Supp. 2d 978, 984 (S.D. Ohio 2000) (the employer provided a legitimate, nondiscriminatory reason by citing that the employee manual stated that an employee's position may not be held open during a leave of absence);*Cline*, 206 F.3d at 666 (finding a catholic school satisfied its burden by asserting it did not renew the plaintiff's teaching contract because she violated her duties as a teacher by engaging in premarital sex, not because she was pregnant).

Summit is required to offer a nondiscriminatory reason to shift the burden back to Steele. This Court need not consider Summit's reason for the truth of the matter asserted. At this stage, it is not dispositive that Bair testified that Albrecht was involved in the final decision to terminate Steele, whereas Albrecht testified that Murta made the final decision to terminate Steele. Both Albrecht and Bair are consistent on the crux of the relevant issue: Steele was fired for distributing confidential information to a non-employee against company policy. Thus, Summit has produced a legitimate and nondiscriminatory reason for its conduct.

*3. Pretext*

Since Summit has offered a legitimate, nondiscriminatory explanation for its actions, the burden shifts back to Steele to establish that Summit's rationale was a mere pretext for discrimination. Steele now bears the burden to demonstrate "evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Pizzimenti*, 666 F. Supp. 2d at 847 (internal quotations and citations omitted). The Sixth Circuit

has reasoned that this burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Cline*, 206 F.3d at 666 (internal quotations and citations omitted). To establish pretext, Steele must demonstrate that Summit's offered rationale: "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Waters v. Drake*, 222 F. Supp. 3d 582, 601 (S.D. Ohio 2016) (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)).

First, Steele argues that Summit's shifting explanations for the decision-making process around Steele's termination are false or contradictory which creates a genuine issue of material fact as to whether Summit's justification is a pretext for discrimination. (*Id.* at 15–17). Steele emphasizes that Summit contends that it discovered that Steele sent confidential information to a non-employee, conducted an investigation, and then made the decision to terminate Steele. (*Id.* at 15). In its position statement to the EEOC, however, Summit presented that it decided to terminate Steele immediately after discovering the breach. Steele argues this is a noteworthy discrepancy given that the evidence demonstrates that Bair first discovered the Master Weekly Report was shared on May 30, 2023, yet Steele was not terminated until June 30, 2023. (*Id.* at 16). Moreover, Steele highlights that as of June 8, 2023, Summit determined that Steele indeed shared the Master Weekly Report with Jones according to a printout produced by the Summit IT department. Thus, Steele believes this casts doubt on Summit's timeline. Even more damaging in Steele's eyes is an email sent from Bair to Vahlberg on June 21, 2023, stating "Karen, I'd like to revisit the decision to allow Amanda Steele to remain employed by Summit." (*Id.* at 16–17) (quoting ECF No. 19-1, Exhibit 14). Steele contends this email proves that Summit did not decide to terminate Steele based on her distribution of the Master Weekly Report at first but instead decided to terminate her once they found a non-pregnant replacement.

Second, Steele contends that Summit's failure to identify a final decisionmaker regarding the firing of Steele also establishes pretext. (*Id.* at 17). In Steele's view, without the identity of the decisionmaker present, there is no evidence of a motive to refute. In sum, Steele reasons that Summit's failure to identify or offer testimony from the ultimate decisionmaker in connection with the discontinuity in its justification could lead a reasonable juror to believe that Summit's offered rationale is false.

Summit counters that Steele has offered no facts establishing that Summit intentionally discriminated against her or that Summit leadership did not honestly believe in the reasons for its termination decision. (ECF No. 22 at 5). In Summit's view, the employer's reason for the termination is the ultimate issue for establishing pretext, ***not*** who the ultimate decisionmaker was. (ECF No. 24 at 4). Summit further contends that Bair and Albrecht's testimony about Summit's basis for the decision to terminate Steele does not constitute hearsay where they rely on records kept in the normal course of business to form their knowledge. (*Id.* at 5).

Even in viewing the evidence in the light most favorable to the Steele, this Court finds that Steele has failed to demonstrate pretext. First, this Court addresses Steele's arguments that Summit's explanations are "admittedly false or contradictory" on multiple points. (ECF No. 23 at 15). Steele is correct that conflicting rationales may be sufficient to establish pretext. (*Id.* at 17) (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)); *see also Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext."). But such conflicting rationales are not present here. In *Thurman v. Yellow Freight Sys.*, a workplace race discrimination case, the Sixth Circuit determined there was evidence of pretext where the employer initially did not mention the employee's performance-related problems when confronted about not

hiring the employee full time, only later to cite performance and attitude issues as the reason during discovery. *Id.* at 1167–1168. Here, however, Summit has been consistent in its rationale that Steele's firing was due to her sending the Weekly Master Report to a non-employee. Summit stated such to Steele when she was fired, to the EEOC, and has maintained such during this litigation. There is no evidence, direct or circumstantial, that Summit ever cited a different justification for the firing. Even in the June 21, 2023, email from Bair to Vahlberg, Albrecht, and two other employees, Bair goes into detail as to why he wanted to revisit Steele's termination decision. In the email Bair writes:

> I'd like to revisit the decision to allow Amanda Steele to remain employed by Summit. The more I think about it and discuss it with the other leadership team members, I can't think of a reason to keep her employed. Below is the information from our employee handbook, which Amanda has signed, that explains which policies she has violated. As a current Director of QA for Summit and former Chief Quality and Compliance Officer, she knowingly and purposefully shared company information with a former leadership member who had left the company (to his personal email address), who is now in direct competition with Summit. The information contains total referral numbers and growth percentages that could be shared with referral sources/potential referral sources to make it appear that Summit is struggling and should not be used. She also could be sending this information for her personal gain in the form of potential future employment with Evolution Home Care. Because of her close relationship to the former leadership team, my fear is that this behavior will continue as long as she has access to Summit information.
>
> The QA department is in a great place and Jessica Spriggs is more than competent to assume the Director of QA role. I spoke with Jessica last week about her interest in returning to a managerial role if the opportunity arose, and she was interested. Therefore, we have a succession plan in place upon Amanda's removal.
>
> I am happy to discuss this the next time you are in the office or at your convenience. I am also happy to include Cynthia, but thought I'd let her settle in before including her.

(ECF No. 19-2, Exhibit 14). Bair lays out a clear and thorough explanation of why he was recommending Steele be terminated and how her actions violated company policy. There is no evidence of a shifting justification for Steele's firing in this email, despite Bair's words indicating that there may have been a point when Summit decided not to terminate Steele initially for the

sending of the Master Weekly Report. This Court reasons that a shifting justification for an adverse employment action, as present in *Thurman*, and a change of decision to implement an adverse employment action, as present here, are distinct.

The evidence shows that Summit discovered the Master Weekly Report was sent on May 30, 2023, Summit became certain Steele was the sender on June 8, 2023, Bair sent his follow up email on June 21, 2023, and Steele was fired on June 30, 2023. In the email, Bair notes that he had continued to discuss the decision with other company leadership, indicating that there were likely ongoing conversations regarding the issue. For these reasons, this Court does not find that Summit informing the EEOC that it terminated Steele immediately, when actually Summit fired her a few weeks later, is an indicator of pretext. Thus, while there may be a discrepancy in whether Summit terminated Steele immediately following confirmation of the dissemination versus a few weeks later after ruminating on the decision more—such timing discrepancy or potential change in punishment for Steele's conduct is not dispositive. Even more significant to this Court's analysis is that Steele does not point to any case law supporting her argument that a company changing its decision to terminate after further evaluation of the employee's conduct is indicative of pretext or deemed a "changing rationale" in the context of the pretext analysis.

Additionally, Steele has proffered no evidence showing that there was ever a different reason for Summit's conduct. While this Court takes notice that there is not a requirement that a plaintiff present direct evidence of pretext, the circumstantial evidence cited by Steele does not persuade this Court.[1] Steele contends that the June 21, 2023, email proves that Summit decided

[1] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 346 (6th Cir. 1997) ("[W]hen a plaintiff proves that the defendant's proffered reasons either have no basis in fact or are insufficient to motivate discharge, a permissive inference of discrimination arises.").

not to fire her but then decided to fire her once it deemed Spriggs, who was not pregnant and not on maternity leave, could replace her. Notably, however, the mere fact that Spriggs replaced Steele is not sufficient to establish pretext, as such a showing was already required as part of the prima fascia case. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 895 (6th Cir. 2020) ("[I]f satisfying the prima facie case requirements alone were enough to establish pretext, then the pretext prong would be superfluous."). Thus, this Court finds that Steele has failed to demonstrate Summit's proffered rationale was pretextual based on false explanations or contradictions.

Second, this Court will address Steele's argument that her distribution of the Master Weekly Report to Jones did not actually motivate the adverse employment action. When evaluating the second mode of pretext, that is that the proffered reasons did not *actually* motivate the employee's discharge, the Sixth Circuit has reasoned:

> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.
>
> If the bare bones elements of a plaintiff's prima facie case were sufficient to make this showing, however, the entire "burden shifting" analysis of *McDonnell Douglas* and its successors would be illusory. No case could ever be culled out after the prima facie stage and every case would have to be determined by a jury. We do not believe that this was the intent of Congress or the outcome envisioned by the Supreme Court in its long line of cases implementing employment discrimination legislation. Accordingly, we hold that, in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of … discrimination.

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Thus, Steele must offer some sort of evidence demonstrating that Steele's pregnancy was more likely Summit's

real motivation behind her termination as opposed to Summit's offered rationale. She has failed to do so.

Steele's primary contention is that without the identity of the decisionmaker in Steele's termination, there is no motive for Steele to refute. As Summit highlights, however, Steele has presented no case law supporting its contention that an employer presenting the identity of the ultimate decisionmaker for the termination is dispositive. Although there is some discrepancy in who made the final decision, Bair testified that he discovered the breach, reported it, and made a recommendation to company leadership regarding his opinion that Steele should be terminated. (ECF No. 19-1 at 33–42). Albrecht also testified that he discussed the decision to terminate with company leadership, and that while he did not make the final decision to terminate Steele, he agreed with John Murta that she should be terminated. (ECF No. 18-1 at 21, 31, 36). While neither Albrecht nor Bair made the final decision, emails produced in discovery document company leadership discussing that Steele's forwarding of the Master Weekly Report was violative of policy. (*See* ECF Nos. 19-2, Exhibit 14; 20-1, Exhibit B).

This Court reasons such testimony and documentation are admissible and indicative of Summit's proffered motive. Steele, however, presents no evidence that refutes Summit's motive, which is her burden at this stage. Steele's arguments regarding the identity of the decisionmaker impermissibly seek to place the burden of establishing pretext on Summit. As the Sixth Circuit reasoned, the mere elements of Steele's prima fascia case, such as her being replaced by non-pregnant Spriggs, are not sufficient additional evidence to establish pretext. Nor are the minor timeline discrepancies discussed above. Without anything more, Steele's claims must fail. For these reasons, this Court finds that Steele has failed to demonstrate pretext.

In sum, it is not unreasonable that Summit may have been taking time to be sure of Steele's conduct, nor is it out of the realm that after further evaluation, Summit's decision regarding what to do may have evolved. The evidence in front of this Court is that Summit became aware that former company leadership, namely Rob Becker, planned to start a competitor business and was attempting to poach Summit employees. Amanda Steele was admittedly one of these employees. Considering this context, it is believable that Summit was sensitive to any potentially disloyal conduct and genuinely fired Steele because of her infidelity. Additionally, this Court need not agree with Summit's business rationale to fire Steele despite Becker, her supervisor, instructing her to send the Master Weekly Report; this Court must only find no evidence that the proffered reason was discriminatory.[2]Accordingly, this Court **GRANTS** Summit's Motion for Summary Judgment as to Steele's pregnancy discrimination claims.

### B. FMLA Interference

"To make a prima facie showing for FMLA interference, a plaintiff must demonstrate that (1) she was an eligible employee; (2) the defendant was a covered employer; (3) that plaintiff was entitled to FMLA leave; (4) the plaintiff gave the defendant notice of intent to take leave; and (5) the defendant denied or interfered with the plaintiff's benefits to which she was entitled." *Gabbard v. Butler Cnty.*, 2025 WL 874731, at *4 (S.D. Ohio Mar. 20, 2025) (citing *Render v. FCA US. LLC*, 53 F.4th 905, 914 (6th Cir. 2022)). The Sixth Circuit evaluates such claims using the *McDonell-Douglas* burden shifting framework, as applied above. *See Donald v. Sybra*, *Inc.*, 667 F.3d 757 763 (6th Cir. 2012) (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)). Summit

---

[2] The Sixth Circuit has reasoned that a finding of pretext cannot be based on disagreement with the employer's business decision. *See Deiters v. Brennan*, 620 F. App'x 413, 416 (6th Cir. 2015) (citing *Hein v. All Am. Plywood Co., Inc.,* 232 F.3d 482, 490 (6th Cir. 2000); *Brocklehurst v. PPG Indus., Inc.,* 123 F.3d 890, 898 (6th Cir. 1997)); *see also Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) ("[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

concedes that Steele has satisfied the first four elements. (ECF No. 20 at 10). Thus, the only dispute is whether the Summit interfered with Steele's FMLA benefits to which she was entitled.

Steele argues that the final element for FMLA interference is not in dispute given that Summit terminated Steele exactly one month after she began maternity leave which interfered with her entitlement to twelve weeks of job-protected leave. (ECF No. 21 at 19). In Steele's view, because Summit cannot produce admissible evidence demonstrating non-pretextual reason for Steele's termination, she is entitled to summary judgment. (ECF No. 25 at 19). On the other hand, Summit maintains that nothing in the record shows that Summit interfered with her FMLA leave. (ECF No. 20 at 10). It is Summit's contention that the sole reason for her termination was her misconduct and there is no evidence to the contrary. (*Id.*).

This Court agrees with Summit. The Sixth Circuit has reasoned that "an employer does not commit an FMLA interference violation where the employer has a legitimate reason, unrelated to the employee's exercise of FMLA rights, for engaging in the challenged conduct." *Robinson v. Compass Grp. USA, Inc.*, 2023 WL 8613501, at *2 (6th Cir. Aug. 16, 2023). As discussed thoroughly above, Summit has presented evidence demonstrating that Steele was terminated solely for her dissemination of the Master Weekly Report to Jones. There is no evidence to the contrary. There is no evidence of Summit having an adverse reaction to Steele's pregnancy news, nor any indication that Steele was burdening the company by taking the leave. Rather, there is documented email evidence that: Summit discovered the Master Weekly Report was shared outside the company; such dissemination was investigated; it was determined that Steele disseminated the Report; and company leadership believed her conduct warranted termination.

In *Robinson v. Compass Grp. USA, Inc.*, the plaintiff alleged that his employer interfered with his right to FMLA leave when it terminated him following a request for additional leave. *Id.*

In response, the employer presented evidence that the plaintiff had performance problems and had violated the employer's fair-treatment policy by making inappropriate comments about his supervisor which an investigation had uncovered. The Sixth Circuit affirmed the district court's grant of summary judgment in favor of the employer, reasoning that the employer had presented a legitimate, non-pretextual reasoning for terminating the plaintiff. *Id.* Similarly here, Summit has presented evidence that Steele disseminated the Master Weekly Report outside the company, and that such conduct was the reason for the termination. Thus, without any evidence to the contrary, this Court finds that Steele has failed to demonstrate that Summit interfered with her FMLA benefits.

Accordingly, Summit's motion for Summary Judgment as to FMLA intervention claim is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, this Court **GRANTS** Summit's Motion for Summary Judgment (ECF No. 20) and **DENIES** Steele's Motion for Summary Judgment (ECF No. 21).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: August 11, 2026**